J-A25014-24                2026 PA Super 50

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| LEON ALEXANDER, | : | |
| | : | |
| Appellant | : | No. 2381 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 17, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0007199-2018

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| LEON ALEXANDER, | : | |
| | : | |
| Appellant | : | No. 2382 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 17, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0007200-2018

BEFORE:  OLSON, J., DUBOW, J., and SULLIVAN, J.

OPINION BY OLSON, J.:                    **FILED MARCH 18, 2026**

Appellant, Leon Alexander, appeals *nunc pro tunc* from the judgment of sentence entered March 17, 2023, as made final by the denial of his post-sentence motion on March 29, 2023.  We are constrained to vacate Appellant's judgment of sentence and remand for a new trial.

In the 1990s, Appellant sexually abused his two minor nieces, C.H. and D.B. In 2018, C.H. reported the abuse. Thereafter, Appellant was arrested and charged with multiple sexual offenses.[1]

Prior to trial, the Commonwealth filed a motion *in limine*, seeking to admit evidence of prior bad acts pursuant to Pennsylvania Rule of Evidence 404(b)(2). More specifically, the Commonwealth sought to introduce evidence that, when Appellant was approximately 16-years-old, he sexually abused S.S., his step-niece.[2] The Commonwealth claimed that such evidence was admissible as evidence of Appellant's common plan or scheme to sexually molest his nieces/step-niece. The trial court convened a hearing on the Commonwealth's motion on January 27, 2020 and, ultimately, granted the Commonwealth's motion.

On December 13, 2022, Appellant's jury trial commenced, during which C.H., D.B., and S.S. testified. The trial court summarized the relevant testimony as follows.

C.H.:

[] Appellant is C.H.'s maternal uncle. During C.H.'s early childhood, she had a good relationship with Appellant, who she called "Uncle Cheeze." Appellant lived with C.H.'s immediate family (two parents, two brothers and one sister, D.B.) at two

---

[1] Appellant was charged at docket number CP-51-CR-0007199-2018 relating to victim, C.H. Appellant was charged at docket number CP-51-CR-0007200-2018 relating to victim, D.B. The matters were consolidated for trial on January 27, 2020.

[2] No criminal charges were filed against Appellant with respect to his alleged sexual abuse of S.S.

different homes; first in a three-story house located [along] North 10th Street, and the second [along] West Butler Street, both situated in the city and county of Philadelphia[, Pennsylvania].

The first time Appellant sexually abused C.H. was a night where she had fallen asleep with Appellant's children in the basement of the [North] 10th Street residence. C.H. woke up to Appellant lying on top of her. C.H. tried to get him off of her, but Appellant forced her legs apart and instructed her to "just stay still." C.H. pleaded with [] Appellant to stop, but he refused. Appellant then inserted his penis into C.H.'s vagina. C.H. explained that upon insertion, "it felt like someone getting ripped open." During the sexual assault, Appellant commanded C.H. to "stop moving . . . He was saying he was almost done." Upon ejaculating, Appellant gave C.H. a towel and instructed her to "wipe [herself] off and go upstairs."

C.H. was also sexually abused by [] Appellant in her bedroom at the 10th Street residence, which she shared with D.B. Once again, C.H. had been asleep when Appellant first got on top of her. C.H. woke up before having her legs forced [apart] by Appellant, [who then inserted] his penis inside her vagina, and command[ed] her to stop moving and not to tell anyone. During this assault, the home's fire alarm went off, forcing Appellant to stop[.] C.H.'s father then entered the bedroom to inquire as to what caused the alarm. When Appellant said the cause was due to food in the kitchen, C.H.'s father left. C.H. believed her father did not ask about what [had occurred] in her bedroom due to his alcoholism. C.H. did not tell her father what occurred due to a sense that no one would believe her or that such information could cause her father to attack Appellant, putting himself in legal peril. C.H. also declined to tell her mother of the abuse, fearing this revelation would prevent her mother from fostering children.

In 1994, C.H. and her family moved to the residence on [West] Butler Street. Appellant again moved in with C.H.'s family. During a family gathering to mourn the death of an uncle, Appellant continued his sexual abuse of C.H. In her room on the second floor, [] Appellant entered, shut the door, and prevented C.H. from leaving. He forced C.H.'s pants down and attempted to insert his penis into her vagina frontally, but was not able to, causing him to bend her over and penetrate her from behind. Afterwards, Appellant again told C.H. to clean

herself off. Similar incidents of sexual abuse by the Appellant occurred in C.H.'s bedroom.

[M]ultiple incidents of sexual abuse [also] occurred in the Appellant's bedroom. On one occasion, Appellant grabbed C.H. as she was walking to the third floor of the home, where Appellant's room was located. He threw C.H. on his bed and penetrated her vagina with his penis. C.H. explained that at this juncture of the serial sexual abuse, she had stopped resisting because she had internalized Appellant's assertion that no one would believe her if she came forward.

[] Appellant also forcibly penetrated C.H. vaginally in the basement of the [North] Butler Street home. Appellant sexually abused C.H. in Appellant's van after her mother sent him to pick C.H. up from her grandmother's home. Appellant found C.H. in a nearby park and stopped the vehicle in an area frequented by drug users and prostitutes. Due to the milieu of this park, C.H. believed that screaming for help would heed no assistance. Appellant told C.H. to get in the back of his van, where he again vaginally penetrated her. At this time, C.H. saw blood on the rag she used to wipe herself. At the home of C.H.'s aunt located at [along] Wayne Avenue in Philadelphia, Appellant []sexually abused C.H. by [inserting] his penis inside her mouth.

[] Appellant finally moved into his own residence, located on Stenton Avenue in Philadelphia. When C.H. [visited] him, Appellant continued [] the abuse by inserting his penis inside her vagina. Because C.H. was menstruating, Appellate "inserted his penis for a few minutes ... [a]nd he stopped." C.H. began her menses at [12].

The sexual abuse stopped when Appellant "disappeared," an event followed by C.H.'s family moving to New Jersey in 1998 when C.H. was 16 years old. C.H. explained how because of the sexual abuse, she acted out. Her bad behavior included stealing, engaging in "risky sexual relationships" (she became pregnant and gave birth to a daughter at 16), selling drugs, cutting herself, and [attempting suicide].

In 2018, C.H. published a book exposing her abuse at the hands of []Appellant. C.H.'s motivation for publishing the book was to give comfort to other children who may have been victims of sexual abuse. The same year her book was published, C.H. reported the sexual abuse to the police.

[S.S.]

[S.S. was] born in 1964 [and] was four or five years old when her parents separated. Her mother moved to New Jersey and her father remained in the city of Philadelphia. [S.S.] and her siblings spent weekends and holidays with their father. [Her] father's three-story home was located [along] Milton Street, in the city and county of Philadelphia. [S.S.] knew Appellant as "Cheeze" and he was her step-uncle, being the brother of her father's partner, Deloris. [S.S.] first met Appellant around the age of six or seven when he would visit her home. Appellant was left to babysit her and her siblings on several occasions. The impetus for his babysitting was either because Appellant was asked by Deloris or because he "volunteered" to watch them for long stretches of time. This would include babysitting "through the night." Around the age of ten or eleven, Appellant began sexually abusing [S.S.] in her bedroom. Appellant would begin by fondling [S.S.'s] breasts and vagina, and then would escalate to removing her clothing, getting on top of her, and rubbing his penis on her vagina. On occasion, Appellant ejaculated on her. On at least one occasion, Appellant told [S.S.] these incidents were "just between us." The sexual abuse occurred for over a year, on at least five separate occasions, and ended after [S.S.] began to menstruate. [S.S.] did not report the abuse because she was afraid that her "super protective" father would kill Appellant and the consequences that would occur to her family. As a result of the sexual abuse, [S.S.'s] quality of schoolwork declined, and she became "promiscuous."

Regarding her connection to C.H. and D.B., [S.S] noted that Deloris was C.H.['s] and D.B.'s aunt. [S.S] encountered C.H. at family gatherings in [C.H.'s] residence, and that on occasion, Appellant would be present. [S.S] first became aware of the sexual abuse suffered by C.H. when C.H.'s book was being promoted. [S.S] reached out to C.H. telling her that she believed C.H. because [S.S] was also a victim of Appellant's sexual abuse.

D.B.:

D.B., born September 13, 1985, lived in the City of Philadelphia until age [12], when she and her family moved to New Jersey. Between the ages of five and seven, she resided at the [North] 10th Street residence, sharing a bedroom with C.H. Appellant

is her uncle. When D.B. was seven years old, Appellant moved into the [North] 10th Street residence.

On one occasion, when D.B. was seven years old, she was playing with toys in the basement. [] Appellant's bedroom was in the basement. Appellant called D.B. over to his bed. When she adhered, Appellant lifted D.B. onto his lap, covered her face with a towel, and placed her on her back with her posterior positioned on his lap. Appellant "began moving [D.B.] around in a circular motion over the top of his penis." During the assault, Appellant's penis was exposed and D.B. was wearing only a nightgown. D.B. described the assault as "discomfort in my butt region and pressure." Appellant's penis went "past" D.B.'s butt cheeks to the point of causing discomfort around her anus. The assault only stopped because D.B.'s father called for her, and Appellant relinquished control. D.B. did not tell her father of the assault because she didn't fully comprehend what had happened, although she knew it was something inappropriate. A few months after the assault, D.B. tried to tell both of her parents what happened but they thought that she was simply [repeating] what she was learning about "good touch and bad touch."

Trial Court Opinion, 12/4/23, 2-8 (internal citations omitted).

At the conclusion of trial, Appellant was convicted of rape and two counts of involuntary deviate sexual intercourse ("IDSI").[3] On March 17, 2023, the trial court sentenced Appellant to an aggregate term of eight to 16 years' incarceration. The trial court also ordered Appellant to comply with the registration requirements under Subchapter I of the Sexual Offender's Registration and Notification Act ("SORNA"), 42 Pa.C.S.A. §§ 9799.51 to

_____

[3] 18 Pa.C.S.A. §§ 3121(a)(1) and 3123(a)(7), respectively.

- 6 -

9799.75.[4]  Appellant filed a post-sentence motion on March 27, 2023, which the trial court denied on March 29, 2023.  Thereafter, on July 18, 2023, Appellant filed a petition for collateral relief under the Post-Conviction Relief Act (PCRA),[5] seeking reinstatement of his direct appeal rights.  The court granted relief on September 8, 2023, thereby reinstating Appellant's right to file a direct appeal *nunc pro tunc*.  This timely appeal followed.

Appellant raises the following issues for our consideration.

1. Was the evidence insufficient to establish that [Appellant] committed [IDSI] against D.B., where the evidence did not establish penetration?

2. Did the trial court err and abuse its discretion in granting the Commonwealth's motion to admit other acts evidence pursuant to the common plan, scheme or design exception to Pa.R.E. 404(b), where the other acts evidence failed to meet the requirements of the exception and was overly prejudicial?

3. Did the trial court err in ordering [Appellant to] register as a sex offender with the Pennsylvania State Police where there was no finding by the jury that Appellant committed a sexual offense on or after April 22, 1996?

_____

[4] Subchapter I of SORNA applies "to sexual offenders who commit their offenses prior to December 20, 2012." ***Commonwealth v. Torsilieri***, 316 A.3d 77, 81 (Pa. 2024); ***see also*** 42 Pa.C.S.A. § 9799.52.  Herein, Appellant was charged with sex offenses which allegedly occurred after April 22, 1996 but before December 20, 2012.  As such, Appellant's SORNA-registration requirements are set forth in Subchapter I.

[5] The PCRA is set forth in full at 42 Pa.C.S.A. §§ 9541-9546.

Appellant's Brief at 4.[6]

In his first issue, Appellant challenges the sufficiency of the evidence supporting his conviction of IDSI against D.B. More specifically, Appellant claims that there was no evidence of penetration presented at trial. We disagree.

Our standard of review is well-settled.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Williams*, 176 A.3d 298, 305–306 (Pa. Super. 2017) (internal citations and quotations omitted).

A person commits IDSI,

_____

[6] We have re-ordered Appellant's issues on appeal because this Court's precedent mandates that a challenge to the sufficiency of the evidence be addressed first. *See Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) (*en banc*) ("Because a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, we must address this issue first.").

when the person engages in deviate sexual intercourse with a complainant:

***

(7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other.

18 Pa.C.S.A. § 3123(a)(7). Deviate sexual intercourse is defined as:

[s]exual intercourse *per os* or *per anus* between human beings and any form of sexual intercourse with an animal. The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures.

18 Pa.C.S.A. § 3101.

D.B. offered the following testimony at trial:

[D.B.]: Once I went in the basement to play with my sister. We were in the basement towards the back. We kept it separated by a curtain for whatever reason I do [not] know. So I would go back there and grab whatever toys I cho[se] to play with. And [on] this day[, Appellant] called me over to him. And I went.

***

[District Attorney]: And where was [Appellant] while you were doing that?

[D.B.]: He was sitting on the bed.

[District Attorney]: And that [is] where he touched you?

[D.B.]: Yes.

***

[District Attorney]: So[,] when [Appellant] called you over what, if anything, did you do?

[D.B.]: I just went over to him.

\*\*\*

[District Attorney]: So you walked over to where he was on the bed. And what happened next?

[D.B.]: He lift[ed] me up and placed me over his lap. He put a towel over my face. And he began moving me around in a circular motion over top of his penis.

[District Attorney]: So when he placed you on his lap[,] how were you both positioned?

[D.B.]: I was positioned just on my back just laying there.

[District Attorney]: So is he sitting on the bed, laying on the bed or something else?

[D.B.]: No. He was sitting.

[District Attorney]: So he was in a sitting position. And were you laying on your stomach on his lap, laying with your buttocks on his lap or something else?

[D.B.]: My buttocks were on his lap.

[District Attorney]: So you were sitting on top of him.

[D.B.]: Yes.

[District Attorney]: And were you facing him or were you facing away from him?

[D.B.]: I was – my face was facing upwards.

[District Attorney]: Was the back of your head on his face or something else?

[D.B.]: No. The back of my head was towards the top of the mattress.

[District Attorney]: So I [am] a little confused about what you [are] describing. If you were sitting on top of him where was his head in relation to yours?

[D.B.]: Not siting like laying just straight back.

[District Attorney]: You were lying straight back?

[D.B.]: Yes.

[District Attorney]: So your buttocks was on his lap. So you were in a laying position?

[D.B.]: Yes.

[District Attorney]: So you were not sitting.

[D.B.]: No, not sitting. Laying straight.

[District Attorney]: So you were laying straight with your buttocks in his lap but your head was on the mattress.

[D.B.]: Yes.

[District Attorney]: And do you remember if you were wearing clothes?

[D.B.]: Just a night gown.

[District Attorney]: And what, if anything, happened to your night gown was it on or off?

[D.B.]: The night gown was kept on.

[District Attorney]: Were you wearing any underwear?

[D.B.]: No.

[District Attorney]: And you said he was moving your body in a circular motion, is that correct?

[D.B.]: Yes.

[District Attorney]: And you described the moving was on top of his penis?

[D.B.]: Yes ma'am.

[District Attorney]: Was his penis exposed?

[D.B.]: Yes.

[District Attorney]: And can you tell us as he was moving in a circular motion[,] tell us what you were feeling in your body.

[D.B.]: I felt discomfort.

[District Attorney]: What do you mean by that? Where did you feel discomfort?

[D.B.]: Discomfort in my butt region and pressure.

[District Attorney]: Did his penis go passed your butt cheeks when you described feeling discomfort?

[D.B.]: It went past, yes.

N.T. Trial, 12/14/22, at 7 -11. The aforementioned testimony, when viewed in the light most favorable to the Commonwealth, sufficiently established penetration *per anus* under to Section 3123(a)(7). **See Commonwealth v. Brown**, 2021 WL 3855797 *1, *3-*4 (Pa. Super 2021) (non-precedential decision) (holding that the victim's testimony that the appellant's "thing" went "in between" the victim's "two [butt] cheeks" was sufficient to establish penetration "for purposes of IDSI"). Thus, Appellant is not entitled to relief on this basis.

In his second issue, Appellant argues that the trial court erred in admitting S.S's testimony and, as such, this Court must vacate his judgment of sentence and remand the matter for a new trial. The trial court herein found that S.S.'s testimony fell within "the common plan, scheme, or design exception" of Pennsylvania Rule of Evidence 404(b). Trial Court Opinion, 12/4/23, at 18. More specifically, the trial court found that "Appellant behaved in a fashion evidencing intent of achieving one encompassing objective: continu[ed] attainment of sexual gratification through the repeated abuse of pre-pubescent and early teenage female family members." **Id.** at 17. In reaching this conclusion, the trial court cited multiple "similarities" that, in its view, existed between Appellant's conduct toward S.S. and Appellant's conduct against C.H. and D.B. **Id.** at 20. In particular, the trial court opined:

> All three of Appellant's victims were his then-under [16-year-old] nieces or step-nieces. The abuse began and ended with [S.S.] and [C.H.] near the same point in their physical development. Appellant maintained access to each victim in their home through his position as a "beloved uncle" tasked with watching over them. He committed similar sexual acts on each victim. Appellant told each victim not to tell anyone and that should they do so, no one would believe them. Numerous attacks were carried out while multiple family members occupied the same or nearby rooms of the home.

*Id*. Because the aforementioned "similarities," "evidence[d] 'a clear signature pattern of conduct,'" it held that Appellant's prior bad acts against S.S. were admissible. *Id*.

On appeal, Appellant claims that the overarching plan or scheme cited by the trial court, *i.e.*, that he "'behaved in a fashion evidencing intent of achieving one encompassing objective: continu[ed] attainment of sexual gratification through the repeated abuse of pre-pubescent and early teenage female family members,'" is "far too generic and broad to constitute a singular, preconceived scheme and could be attributed to nearly any male who committed a sexual offense against a child." Appellant's Brief at 28-29 (citation omitted). Appellant also argues that "the allegations here fall woefully short" of demonstrating a "'virtual signature'" necessary to satisfy the requirements of the common plan, scheme or design exception of Rule 404(b). *Id.* at 29. In Appellant's view, the "lack [of] 'any uniqueness,'" in conjunction with "significant" differences between the criminal episodes, renders the trial court's admission of S.S's testimony as evidence of a common

- 13 -

plan, scheme or design an error of law. *Id.* at 34. Upon careful consideration, we are constrained to agree.

"We review a trial court's decision to grant a motion *in limine* for an abuse of discretion." *Commonwealth v. Ribot*, 169 A.3d 64, 67 (Pa. Super. 2017) (citation omitted). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Johnson*, 107 A.3d 52, 68 (Pa. 2014) (citation omitted).

This Court previously set forth the law regarding the admission of prior bad act evidence as follows:

> Evidence of distinct crimes is not admissible against a defendant [subject to prosecution] for another crime solely to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character.
>
> These other purposes include[,] *inter alia*[,] (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the other; or (5) the identity of the person charged with the commission of the crime on trial.

*Commonwealth v. O'Brien*, 836 A.2d 966, 969 (Pa. Super. 2003) (citations omitted). If, in a criminal case, the court finds that such evidence is admissible for non-propensity purposes, Rule 404(b)(2) requires that the

- 14 -

"probative value of the evidence outweigh[ ] its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Importantly, to assess Appellant's claim, we must address a recent decision promulgated by our Supreme Court which thoroughly outlined the "parameters of the 'common plan, scheme and design' [] exception" to Rule 404(b)'s prohibition against propensity evidence. ***Commonwealth v. Walker***, 2026 WL 247429, *1 (Pa. 2026).[7]

In ***Walker***, the appellant, Derrick Walker, was charged in July 2019 with three counts of rape, relating to his assault of "three different victims on three separate occasions–P.C., in January [] 2011; T.A., in December [] 2014; and B.H., in January [] 2015." ***Id.*** The Supreme Court detailed the relevant facts of each assault as follows:

> [] On January 20, 2011, around midnight, P.C. left her home in the Oxford Circle neighborhood in Philadelphia[, Pennsylvania] to walk to a nearby 7-11 convenience store to purchase cigarettes. She was outside the store when Walker, whom she did not know, approached, "flashed money at [her,] and said 'you know what to do for this.'" Although P.C. testified that she was not a prostitute and that she "had a bad feeling[,]" she followed Walker to the alley behind the 7-11; P.C. claimed she did so because she was scared. Once isolated, Walker pushed P.C. to her knees and tried to force her to perform oral sex on him. When she resisted, he punched her in the face and threw her body against a car that was parked in the alley. Walker then forcibly pulled down P.C.'s pants and raped her. Afterwards, P.C. pulled up her pants and followed him back to the front of the store. When Walker told her he was going to get money to pay her, P.C. stated she was not a prostitute. He

---

[7] The decision was authored by Justice McCaffery, and joined in full by Justices Donohue and Wecht. Justice Dougherty joined the decision in part. Chief Justice Todd authored the dissent, which Justices Mundy and Brobson joined.

then walked away, and P.C. ran home. She testified that she took off her clothes and cried for hours until her husband woke up and called the police. P.C. went to the hospital the next morning and underwent a sexual assault examination. The nurse examiner prepared a rape kit report. Sperm recovered from a vulva swab resulted in a male DNA profile that did not match any existing profiles in the database.

[] On the morning of December 2, 2014, T.A., a recovering drug addict, attended a methadone program near 7th Street and Girard Avenue in Philadelphia. After leaving the program around 11:00 a.m., she headed to a nearby doughnut shop where she would often meet with friends. When she arrived, Walker, whom she did not know, was standing outside. He inquired whether she was interested in purchasing headphones. When T.A. expressed interest, Walker asked her to walk up Girard Avenue with him because he also "had drugs on" him and did not want to exchange anything on the street. As they walked, Walker put his arm around T.A. She was not alarmed by this because of her prior experience purchasing drugs — sellers would often put their arms around buyers to give the appearance of familiarity. However, T.A. then felt a knife at the base of her neck. Walker calmly told her, "you're going to do what I'm telling you to do" and "[w]e're going to keep walking."

Walker led T.A. across Girard Avenue towards an alley. As he did so, he took her money and cell[ular tele]phone. When they reached the alley, Walker pushed T.A. to the ground and forced her to perform oral sex on him. He then grabbed her face, turned her around, and pushed T.A. against a fence before raping her. Next, Walker instructed T.A. to walk in the opposite direction from him; he did not return her phone or money. T.A. ran to a store a few blocks away, where she immediately called her boyfriend and the police. She underwent a sexual assault examination at the Philadelphia Sexual Assault Response Center (PSARC). The nurse examiner prepared a rape kit report. Sperm recovered from a perianal swab resulted in a male DNA profile that did not match any existing profiles in the database.

[] B.H. recently moved to Philadelphia and was living in the area of 55th and Thompson Streets. At approximately 11:30 a.m. on January 12, 2015, as she was exploring the neighborhood, she asked a woman where she could buy loose cigarettes (commonly known as "loosies"). As she attempted to follow the woman's directions, she ran into Walker, whom she had never

- 16 -

met. B.H. then asked him where she could purchase "loosies." Walker responded that he sold them, but did not have any on him at that time. He told her to follow him, which she did. Walker led B.H. to the rear of a nearby house. B.H. handed Walker some money, and he then entered the property. While she waited for him, B.H. made a phone call. After the call ended, she "felt someone come behind [her], put their hand over [her] mouth, and trip [her] forward onto the ground [and] on [her] stomach." When her attacker attempted to pull down her pants, she screamed; he then struck her in the back with a tire iron. The attacker was able to remove her pants and forcibly rape B.H. while she begged him to stop. The attacker then fled. B.H. ran home and immediately called the police, who were able to recover the tire iron. B.H. underwent a sexual assault examination at PSARC, and the nurse examiner prepared a rape kit report. Sperm recovered from a perianal swab resulted in a male DNA profile that did not match any existing profiles in the database.

*Id.* at *2 (internal citations omitted). The unknown DNA profile was not linked to Walker until July 2019. At that time, the Commonwealth criminally charged him with various sexual offenses at three separate dockets.

Thereafter, the Commonwealth sought to consolidate the three dockets under Pa.R.Crim.P. 582 for trial.[8] The Commonwealth argued that consolidation was permissible because "each assault would be admissible in a

_____

[8] Pa.R.Crim.P. 582 provides, in relevant part, as follows:

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

*Id.* at 582(a)(1).

trial for the others [under Rule 404(b)] because the assaults shared sufficient similarities to establish a common plan, scheme or design." *Id.* at *3. The trial court granted the Commonwealth's motion and the matter proceeded to trial. Ultimately, a jury found Walker guilty of multiple sexual offenses at each docket. Thereafter, Walker appealed his conviction and asked the Supreme Court to address, *inter alia*, "what test should be employed in determining when 'other act' evidence satisfies the 'common plan' exception under Pa.R.E.404(b)[?]" *Id.* at *5.

To address Walker's claim, Justice McCaffery, who authored the majority opinion, traced the "genesis" of the common plan, scheme or design exception to Rule 404(b) "back to [the Court's] nineteenth century decision in ***Shaffner v. Commonwealth***, 72 Pa. 20 (1872)." ***Walker***, 2026 WL 247429 at *6 In ***Shaffner***, the Commonwealth sought to introduce evidence that Shaffner, the defendant, who was on trial for poisoning his wife, previously poisoned John Sharlock. In considering whether such evidence was admissible under the common plan, scheme or design exception, our Supreme Court opined:

> To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other. Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to [burden] a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offences charged against him, of which, if fairly tried, he might acquit himself. From the nature and prejudicial character of such evidence, it is obvious

it should not be received, unless the mind plainly perceives that the commission of the one tends, by a visible connection, to prove the commission of the other by the prisoner.

*Id.* at 65. This pronouncement, as indicated in *Walker*, resulted in the evolution of a "two-fold test to determine the admissibility of (arguably propensity) evidence pursuant to the common plan, scheme or design exception." *Walker*, 2026 WL 247429 at *7. In particular, such evidence is admissible if:

(1) a previously conceived plan that linked the prior crime and present crime together for a singular purpose or (2) crimes so similar that they must have been committed by the same actor.

*Id.* The first exception, *i.e.*, the "'linked plan' exception" requires the prosecutor to establish "that the defendant formed 'a single, overall grand design' and that each bad act or crime is an 'integral component of the same plan" while the second exception, *i.e.*, the "*modus operandi*" exception, demanded "a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person." *Id.*

In the *Walker* Court's view, *Shaffner*'s attempt to circumscribe the common plan, scheme or design exception so as to minimize propensity evidence was subsequently "relaxed" over the years. *Walker*, 2026 WL 247429 at *7, *citing* **Commonwealth v. Wable**, 114 A.2d 334 (Pa. 1955). In particular, the High Court determined that "*Shaffner*'s two-pronged common plan, scheme or design exception morphed into a more general consideration as to whether the defendant's other bad acts share 'sufficient similarities' with the offense on trial." *Walker*, 2026 WL 247429 at *7. This

"watered-down" approach subsequently became known as the "logical connection" test. *Id.* at *8 and *13. The **Walker** Court opined, however, that the "logical connection" test failed to "require proof of an overarching plan or scheme linking the criminal acts together" or "demand the same high level of similarities between the acts as admission under the *modus operandi* or signature crime exception" as originally contemplated by **Shaffner**. *Id.* at *13. Instead, the "logical connection" test "appear[ed] to be a hybrid of [the two **Shaffner**] exceptions" and allowed evidence of other acts if the acts "are **similar enough** for a jury to conclude the same perpetrator committed them." *Id.* (emphasis in original). This, per the **Walker** Court, "[ran] afoul to the purpose of Rule 404(b) and invite[d] the admission of impermissible propensity evidence." *Id.*; **see also id.** at *14 (explaining that, because prior decisions "simply require[d] 'shared characteristics' between the crimes and the victims" to be admissible under the common plan, scheme and design exception to Rule 404(b), "our case law has strayed from traditional exceptions to the preclusion of other bad acts and teetered on the line of allowing propensity evidence"). Accordingly, the High Court concluded that it was "time to return to the origin of the common plan, scheme or design exception, and limit the admission of other bad acts evidence to those cases involving a common goal (*i.e.*, 'linked plan') or signature crime." *Id.* at *15.[9]

_____

[9] Justice Dougherty joined the Majority Opinion in so far as it disavowed the logical connection test. **See Walker**, 2026 WL 247429, at *28 (I agree with
*(Footnote Continued Next Page)*

Thereafter, the **Walker** Court detailed the type of showing the Commonwealth must make for a court to allow other acts evidence to be admitted under the common plan, scheme, or design exception to Rule 404(b). It stated:

> When the admissibility of the defendant's other bad acts is premised upon the common plan, scheme or design exception, the Commonwealth must establish either: (1) the offenses constituted "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same perpetrator — or; (2) the offenses were linked to achieve a common goal.

*Id.* at *16, *citing* **Shaffner**, 72 Pa. at 65. The Court then determined that the trial court abused it discretion in granting the Commonwealth's motion to consolidate the three rape cases for trial, in part, on the basis that the three assaults shared sufficient similarities to establish a common plan, scheme or design. In reaching this conclusion, the Court explained that Commonwealth failed to present "any evidence of a preconceived plan [in Walker's mind] or [had a] common goal linking the three rapes together." **Walker**, 2026 WL 247429 at *16. Instead, "the evidence reasonably suggested [that Walker] raped women when he was presented with the opportunity to do so." **Id.** at

---

the majority "the time has come for this Court to acknowledge that the 'logical connection' test runs afoul of the purposes of Rule 404(b) and invites the admission of impermissible propensity evidence.") (J. Dougherty, concurring and dissenting opinion). Justice Dougherty, however, wrote separately to express his opinion that, "in appropriate circumstances, an 'unlinked plan' theory could serve as an exception to Rule 404(b)'s general rule of exclusion." *Id.* at *30; *see id.* at *30, n.3 (J. Dougherty explaining: An "'unlinked plan' theory allows for admissibility where the actor applied the same plan or methodology to accomplish unrelated crimes.").

*14. In addition, the High Court did not believe that the facts of each rape to be "so unique or distinctive to qualify as signature crimes." *Id.* at *14 and *16. Instead, it was apparent that the Commonwealth and trial court "relied on the 'logical connection' between these similar rapes, a far too lax interpretation of the common plan, scheme or design exception." *Id.* at *16. Based upon the foregoing, the Court vacated Walker's judgment of sentence and remanded the matter for a new trial.

In applying the foregoing to the facts to the instant case, we initially note that, in deciding to admit S.S.'s testimony at trial, it is apparent that the trial court applied the "logical connection" test that the ***Walker*** Court determined "runs afoul to the purpose of Rule 404(b) and invites the admission of impermissible propensity evidence." *Id.* at *13. Indeed, in assessing whether to allow the admission of S.S.'s testimony under Rule 404(b) as evidence of a common plan, scheme or design, the trial court reviewed the facts underlying the other acts evidence, *i.e.*, S.S.'s abuse, and the facts underlying the current criminal charges, *i.e.*, C.H. and D.B.'s abuse, and determined that they were similar enough to evidence a common plan, scheme or design. ***See*** Trial Court Opinion, 12/4/23, at 20 (opining that the similarities included, *inter alia*, the victims' ages, how Appellant secured access to the victims, and the sexual acts committed against each victim). As our foregoing discussion of ***Walker*** demonstrates, the trial court's identification of the overlapping similarities exhibited in Appellant's criminal conduct no longer comports with Pennsylvania jurisprudence governing the

application of the common plan, scheme or design exception under Rule 404(b). Thus, the trial court's determination cannot stand.

In addition, we conclude that the evidence presented falls woefully short of meeting the threshold for admission under Rule 404(b) as set forth in **_Walker_**, **_supra_**. The evidence established the following circumstances of Appellant's assaults against S.S., C.H., and D.B.

- Appellant allegedly abused S.S. in the 1970s.

- Appellant allegedly abused C.H. and D.B. in the 1990s.

- Appellant was 16 years old at the time he alleged abused S.S.

- Appellant was approximately 30 years old at the time he allegedly abused C.H. and D.B.

- Appellant allegedly abused S.S. when she was 10 years old, for a period of one year.

- Appellant allegedly abused C.H. when she was 10 years old and continued until she was 16 years old.

- Appellant allegedly abused D.B. on one occasion, when she was seven years old.

- Appellant allegedly abused S.S. by foundling her breasts and vagina, removing her clothing, rubbing his penis on her vagina and ejaculating on her.

- Appellant allegedly abused C.H. by repeatedly raping her and, on one occasion, forcibly placing his penis in her mouth.

- Appellant allegedly abused D.B. once by rubbing his penis against her buttocks, wherein she felt "[d]iscomfort in [her] butt region and pressure." N.T. Trial, 12/14/22, at 11.

- Appellant allegedly abused S.S. in her bedroom.

- Appellant allegedly abused C.H. in the basement of her family home, her bedroom in the family home, his bedroom in the family home, his vehicle, his residence after he moved out of C.H.'s family home, and her aunt's house.

- Appellant allegedly abused D.B. in the basement of her family home.

The Commonwealth did not present any evidence that Appellant "had a preconceived goal in mind, other than satisfying his own salacious interests." **Walker**, 2026 WL 247429 at *14. Instead, "the evidence reasonably suggested [that Appellant sexually assaulted young] women when he was presented with the opportunity to do so." **Id.** In this same vein, the record reveals nothing unique, unusual, or distinctive about the way S.S., C.H., and D.B. were sexually abused.[10] To the contrary, the chief similarity is that each victim was Appellant's niece or step-niece which, unfortunately, "is the kind of familial connection that is all too common when children are sexually abused." **Commonwealth v. Smith**, 2024 WL 4650893 *1, *6 (Pa. Super. Nov. 1, 2024) (non-precedential decision). Hence, their accounts "establish[], at most, the commission of crimes or conduct in the past 'of the same general class,' namely physical and/or sexual assaults." **Commonwealth v. Bidwell**, 196 A.3d 610, 626 (Pa. Super. 2018). Because the Commonwealth failed to

_____

[10] While the **Walker** Court opined that the "signature crime, or *modus operandi*, exception [was] most relevant when the identity of the perpetrator [was] at issue," it analyzed Walker's actions to determine whether they were "so unique or distinctive to qualify as a signature crime" even though Appellant's identity was not in question because DNA evidence tied Appellant to the criminal episodes. **See Walker**, 2026 WL 247429, at *15-*16; **see also id.** at *3.

establish that the offenses involved a "common goal (*i.e.*, 'linked plan') or a signature crime," we hold that, by allowing S.S.'s testimony as evidence of a common plan or scheme, the trial court abused its discretion. **Walker**, 2026 WL 247429, at *15.

We further hold that the admission of S.S.'s testimony was not harmless. **See Commonwealth v. Hicks**, 156 A.3d 1114, 1157 (Pa. 2017) (Wecht, J., dissenting) ("It is natural and well-nigh inevitable . . . that a juror will conclude that, if a person has assaulted women before, he likely will do so again."). As stated by the trial court, S.S.'s testimony

> was used to corroborate the abuse inflicted upon C.H. and D.B. [b]ecause the report of their abuse had been delayed due to their age[ and] no physical evidence was available to corroborate their respective testimony. Thus, had [S.S.'s] testimony been precluded, the Commonwealth would have been forced to rely exclusively on the testimony of C.H. [and] D.B., which would have severely hindered the prosecution.

Trial Court Opinion, 12/4/23, at 22-23. It is apparent, therefore, that the admission of S.S.'s testimony was essential to the Commonwealth's case and could have improperly bolstered C.H. and D.B.'s credibility.[11] **See Hicks**, 156 A.3d 1156-1157 (J. Donohue, dissenting) (noting that the "Commonwealth [] repeatedly and unambiguously argued that its case against [the defendant] was largely circumstantial and that it viewed the bad acts testimony as

---

[11] In this case, we cannot regard the admission of S.S.'s testimony as harmless because, as the trial court conceded, there was no other physical evidence in this case to corroborate C.H. and D.B.'s testimony. Hence, their credibility was paramount.

- 25 -

essential to proving the elements of first-degree murder beyond a reasonable doubt" and, as such, the admission of the bad acts evidence was "far from harmless"). In addition, it improperly required Appellant to defend against criminal acts against S.S., for which he was not charged. *See Shaffner*, 72 Pa. at 68 ("It was therefore unjust to the prisoner to compel him, on his trial for the murder of his wife, to defend against the charge of murdering Sharlock."). We are therefore constrained to vacate Appellant's judgment of sentence and remand for a new trial.[12]

Judgment of sentence vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judge Dubow joins this Opinion.

Judge Sullivan concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/18/2026

---

[12] Due to our disposition of this matter, we need not address the final issue raised by Appellant on appeal.

- 26 -